# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL B. DAVIS,<br><br>              Plaintiff,<br><br>       vs.<br><br> CORY ARCANGEL, and DOES 1-10,<br><br>              Defendants. | Case No.: 1:21-cv-03663-ENV-VMS<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff, Paul B. Davis. ("Plaintiff"), by and through his attorneys, Mazzola Lindstrom LLP, as and for his Complaint against defendant, Cory Arcangel ("Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.     This a civil action seeking declaratory and injunctive relief, and for an accounting and damages relating to Plaintiff's joint authorship and copyright ownership of works of fine art that Plaintiff and Defendant jointly created pursuant to the Copyright Act, 17 U.S.C. §101 *et seq.*

2.     Despite Plaintiff's and Defendant's joint authorship and copyright ownership of these works of art, Defendant has intentionally and deliberately misrepresented, passed off, caused to be credited and/or allowed to be credited the works as authored solely by Defendant.  Defendant has refused Plaintiff's demands to correct the misrepresentations and to account for and distribute to Plaintiff his share of income and profits that Defendant has received by claiming sole authorship of these jointly created works.

3.     Accordingly, Plaintiff brings this action for a declaratory judgment of his joint authorship and ownership of the works, for injunctive relief enjoining Defendant from falsely attributing the works solely to himself and directing Defendant to correct prior and current false attributions of the works; and for compensation to Plaintiff of his share of the income and profits

from the works. Plaintiff also seeks a declaratory judgment of his rights to sell the works that he jointly created with Defendant, and/or to prepare new derivative works derived from the jointly authored works, subject to an obligation to account for a share of profits from such sales. Finally, Plaintiff seeks his costs and reasonable attorney's fees in connection with this action.

## PARTIES

4.      Plaintiff, Paul B. Davis, is a United States citizen residing in London, England.

5.      Defendant, Cory Arcangel, is a United States citizen residing in Brooklyn, New York, and Stavanger, Norway.

6.      The true names, identities and capacities, whether individual, associate, corporate or otherwise, of Defendants Does 1 to 10, inclusive, and each of them (the "Doe Defendants"), are unknown to Plaintiff at this time, who therefore sues the Does by such fictitious names. When the true names and capacities or participation of the Doe Defendants are ascertained, Plaintiff will amend this complaint to assert their true names, identities and capacities. Plaintiff is informed and believes and thereon alleges that each of the Doe Defendants sued herein is responsible for the wrongful acts alleged herein, and therefore liable to Plaintiff in some manner for the events and happenings alleged in this complaint. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, the Doe Defendants were and are doing business and/or residing in this District.

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 17 U.S.C. §101, *et seq.*, and 28 U.S.C. §1331 (federal question jurisdiction), 1338(a) and 1338(b) and supplemental jurisdiction for the non-federal cause of action pursuant to 28 U.S.C. §1367(a).

8.      This Court has authority to order declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, because there is a live and actual controversy between Plaintiff and Defendant that includes a dispute over proper allocation of authorship, crediting and exhibition of the works of fine art in question.

9.      This Court has personal jurisdiction over Defendant based upon Defendant's continuous and systematic contacts within this District, including because Defendant resides in this District, and in connection with the copyrights and works of art that Defendant has exploited, which are at issue in this action.

## VENUE

10.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because Defendant resides in this District and is subject to personal jurisdiction in this District, and because a substantial amount of the events and injury occurred in this District.

## FACTS

**Plaintiff's Pioneering Artwork**

11.      Plaintiff is a visual and multimedia artist and musician.  Plaintiff's artwork uses outdated or obsolete computer technologies such as Nintendo game systems and cartridges to perform specialist interventions in the digital art medium.

12.      When Plaintiff was a student at Oberlin College in the late 1990s, Plaintiff pioneered the use of hacked Nintendo Entertainment System video game cartridges as sculptural objects, modifying the existing code to create new, alternative works from these ready-made objects, and modifying the physical cartridges themselves, bridging the gap between computers and art.

13.      Plaintiff's more recent work has involved aestheticizing the glitches commonly

encountered in digital video compression.

14.    Plaintiff earned a bachelor's degree in music, focusing on electronic and computer music, from the Oberlin Conservatory of Music in Oberlin, Ohio.  He subsequently studied studio art and technology at the School of the Art Institute of Chicago and earned his Ph.D. in fine art from Central St. Martins in London.

15.    Plaintiff has exhibited internationally, including at the Whitney Museum of Modern Art, Whitechapel Gallery, HMKV, Witte de With Centre, Akademie der Kunste Berlin, New Museum of Contemporary Art, Tate Britain, International Film Festival Rotterdam, San Francisco Museum of Modern Art, and the Sonar Festival.

16.    Plaintiff has seventeen years of experience teaching fine art in higher education in London, including at Goldsmiths University, the Royal College of Art, and Ravensbourne College of Design.

17.    Plaintiff and Defendant had collaborated on various projects starting in the late 1990s and had been roommates at Oberlin College, following which Plaintiff moved to Chicago for graduate school and Defendant moved to New York.

**Plaintiff's Nintendo Cartridge Work**

18.    Plaintiff first presented his reprogrammed Nintendo cartridge work publicly in the spring of 2000.  Plaintiff wrote audio and graphics code for the Nintendo NES and created a hacked cartridge entitled "Bachelor of Music." At that time, Plaintiff was, to his knowledge, the first and only person reprogramming video game hardware as art.

19.    In the autumn of 2000, Plaintiff created a hacked Nintendo work called *Super Abstract,* which was a "ROM hack" of Super Mario Brothers where Plaintiff removed all the game's characters and replaced them with abstract shapes while leaving the gameplay intact.

20.    Plaintiff later founded the "BEIGE" art collective in or about 2000, including BEIGE Records (formed in or about 1997-1998) and the BEIGE Programming Ensemble, together with Defendant, Joe Beuckman, and Joseph Bonn.

21.    Plaintiff and BEIGE then created BEIGE's first Nintendo artworks, and developed Plaintiff's hacking into a distinct body of work that has been shown internationally.

**Plaintiff and Defendant Created the Joint Works**

22.    In late 2000, shortly after Plaintiff's Nintendo-based work was first publicly presented, Defendant asked Plaintiff to work together on future cartridge artworks.

23.    During the early 2000s, Plaintiff and Defendant collaborated on and jointly authored several works, including, among others, "*Fat Bits,*" "*Landscape Study*," "*Super Mario Clouds*," "*Rudy's Cake Walk*," "*Naptime*," and "*Totally Fucked.*"

24.    *Fat Bits* and the works created in the process of developing *Fat Bits – Flag, Noise,* and *American ROM –* was Plaintiff's and Defendant's initial collaboration on Nintendo works.  It originated from and incorporated Plaintiff's manipulation of software from a Nintendo video game cartridge.  Plaintiff constructed the hardware for *Fat Bits*, disassembled the game cartridges, removed the ROM chips from the Nintendo games cartridges, modified the circuit boards of the Nintendo cartridges to work with new chips, modified the cartridge casings themselves, programmed new chips using the code he and Defendant had written, and assembled the cartridges with the new chips in them.

25.    For *Fat Bits*, Plaintiff collaborated with Defendant on graphics code and modified computer code, and focused on the audio portion for this work, writing code to generate the audio portion of the work.

26.     On May 30, 2001, Defendant emailed Plaintiff regarding their plans to exhibit *Fat Bits* at the Deadtech Gallery in Chicago (after Deadtech offered a show to Plaintiff in March 2001): "I think we forgot to make a decision . . . I think the show should have BEIGE on it.  It makes sense because it's all the same thing . …. as far as who did what goes the only reason it has to be clear is because of Urbandale [a work created by Defendant alone, which was added to the show] cause the commissioning place is really picky about how it is represented in the public sphere." This message from Defendant laid the groundwork for the parties' collaborative practice and crediting moving forward, according joint credit to their collaborative works, regardless of who worked on what portions (audio composition, video/graphics composition, audio coding, video coding, equipment construction/configuration, etc.).

27.     *Fat Bits* was exhibited at the Deadtech show in Chicago in June 2001, where the parties performed as their band The 8-Bit Construction Set. The exhibition was written about in the Chicago Reader on July 5, 2001 (https://chicagoreader.com/music/new-sounds-from-old-technology/) and the Independent Curators International (https://curatorsintl.org/images/assets/Glitch.pdf) tracing the history of "glitch" art in Chicago and singling out the Deadtech show as a "groundbreaking exhibition."

28.     Plaintiff and Defendant created *Landscape Study* in June 2002 as partners on a grant awarded by the New York State Council on the Arts; it was commissioned and exhibited as a joint work created by Plaintiff and Defendant.  Plaintiff co-authored the video code, completely rewriting code that Defendant sent to him  that also incorporated code that Plaintiff wrote in July 2001 to experiment with scrolling graphics, and authored the music and audio code for *Landscape Study*, which was exhibited at Bitforms Gallery in New York starting June 20, 2002 with Plaintiff and Defendant listed as joint authors.

6

29.    *Super Mario Clouds* also originated from and incorporated Plaintiff's Nintendo software manipulation techniques.  Plaintiff first discussed with Defendant collaborating on *Super Mario Clouds* in April 2001.  *Super Mario Clouds* incorporated wholesale the code created and used for *Landscape Study*, Plaintiff's and Defendant's earlier jointly created work.  Plaintiff and Defendant publicly presented *Super Mario Clouds* for the first time at the Language and Encoding Symposium at SUNY Buffalo in November 2002.  Defendant wrote and included language acknowledging Plaintiff's contributions in the "narrative" regarding *Super Mario Clouds* that Defendant posted by at least 2003 on the "Cory Arcangel" sub-page of the Beige Records website, which was unchanged for at least 2003, 2004 and into December 2005, as shown in archived versions of the narrative captured by third-party website www.archive.org.  *See, e.g.*, https://web.archive.org/web/20030418093944/http://www.beigerecords.com/cory/21c/21c.html, https://web.archive.org/web/20041204174909/beigerecords.com/cory/21c/21c.html, https://web.archive.org/web/20051202084603/beigerecords.com/cory/21c/21c.html.

30.    A January 19, 2003 article that appeared on the front page of the New York Times Arts section regarding work by art collectives and collaborators credited Beige as the author of *Super Mario Clouds*:



*Forcefield's "Meta Radeo" (2002): a knitted shroud and artificial hair over a mannequin.*

# Doing Their Own Thing, Making Art Together

### By HOLLAND COTTER

To many Americans, the world feels more threatened and threatening today than at any time since the 1960's. Terrorism, nuclear proliferation, the prospect of war on Iraq and ever tightening security measures at home have sent a hum of tension through daily life.

In the 1960's, comparable tension, excruciatingly amplified, produced a big response: the spread of a countercultural, one that began with political protest movements and became an alternative way of life. Among other things, it delivered a sustained, collective "no" to certain values (imperialism, moralism, technological destruction), and a collective "yes" to others: peace, liberation, a return-to-childhood innocence.

The collective itself, as a social unit, was an important element in the 60's utopian equation. Whatever form the concept took — the commune, the band, the cult — its

**A new movement of collectives, with names like rock bands, harks back to the 60's (an uncool notion for these digital-age multitaskers).**

implications of shared resources, dynamic interchange and egos put on hold made it a model for change.

Even the art world, built on a foundation of hierarchies and exclusions, produced its own versions. Activist groups like the Artworkers Coalition and the Black Emergency Cultural Coalition made concerted attempts to pry open institutional doors and let in a multicultural world. Simultaneously, nonmilitant movements like the Dada-inspired Fluxus produced an ephemeral, give-away, anyone-can-do-it art that amounted to a kind of passive resistance to the existing market economy. Both approaches — one political, one gentle — changed the way art was thought about, and the way it looked.

The collective impulse has never died out in American art; and now it is surfacing again, for the most part outside New York. In cities like Milwaukee, Providence, R. I., St. Louis and Philadelphia, as well as several in Canada, an old countercultural model, often much changed, is being revived, in some cases by artists barely out of their teens.

Many of the new art collectives are virtual: they reside on the Internet, that intrinsically collective medium. They are fluid in size, and members may not even know the
Continued on Page 36

*The Royal Art Lodge's "Untitled" (1997).*

*Beige's "Super Mario Clouds 2002."*

See [https://www.nytimes.com/2003/01/19/arts/art-architecture-doing-their-own-thing-making-art-together.html](https://www.nytimes.com/2003/01/19/arts/art-architecture-doing-their-own-thing-making-art-together.html). The New York Times article focused on the work of collectives, and discussed the work of BEIGE as a group, rather than of any individual member of BEIGE. The representation regarding the authorship of *Super Mario Clouds* ("Beige's Super Mario Clouds") in the article is consistent with Defendant's representation to the author that, "BEIGE started as a record label [Beige Records USA] in 1997 and as we started to display our media/installation work we adopted the name 'BEIGE programming ensemble', now in 2002 we simply refer to everything we do [performances, media art, events] as BEIGE." (Although Defendant represented

8

to the other members of BEIGE that the author had specifically requested an image of *Super Mario Clouds,* in fact NYT art critic Holland Cotter had asked for an image of any hacked cartridge; Defendant chose to send an image of *Super Mario Clouds* as representative of BEIGE.)

31.     *Rudy's Cake Walk* featured music that Plaintiff and Defendant co-created with a music band they had formed called 8-Bit Construction Set.  Plaintiff played a significant role throughout the creation of this work during the autumn/winter of 2001 in collaboration with Defendant, creating and providing recordings of main beats and melodies for the project for use in a studio recording session, and providing instructions for how to structure the song.  Defendant then used all of the audio Plaintiff provided in the final recording, and followed Plaintiff's instructions for the structure of the song.  In February 2002 Plaintiff proposed and the parties adopted the title "*Rudy's Cakewalk*" for this work.

32.     Plaintiff and Defendant created *Naptime* in 2003.  Plaintiff developed the audio and audio code.

33.     *Totally Fucked* similarly relied upon Plaintiff's manipulation and modification of Nintendo video game software and code.  On June 22, 2003, Defendant emailed Plaintiff Nintendo NES source code of an un-named work that generated an image of Mario; the source code was only partially-functioning and Defendant wrote that, "you can start with this …his [Mario's] head is a little messed up but I am trying to fix it...," and implicitly sought Plaintiff's help.  Plaintiff updated, modified and added to the source code, to resolve the problems with Defendant's code, and emailed Defendant the updated code on June 27, 2003.  The version of the code that Plaintiff emailed to Defendant, with Plaintiff's contributions, compiles to a program which is identical to the work *Totally Fucked* that is currently available for download on Defendant's website.  On July 5, 2003, Plaintiff sent Defendant an email discussing unrelated events, the first paragraph of which

9

was a single phrase: "totally fucked". The same phrase was then used as the title of the previously un-named work.

34.     Plaintiff and Defendant agreed to joint authorship for these and other works they jointly created (collectively, the "Joint Works").  Among the other Joint Works created by Plaintiff and Defendant are:

a.   *Untitled (flag)* (May 2001) – an animated image of the American flag with the text, "an American ROM," which was created as a prototype for the first BEIGE exhibition, but not exhibited or sold.  Plaintiff co-authored the video code for this work with Defendant.

b.   *Untitled (noise)* (May 2001) – animated random colors on a screen, which was created as a prototype for the first BEIGE exhibition, but not exhibited or sold. Plaintiff co-authored the video code for this work with Defendant.

c.   *Video Ravingz* [*sic*] (2003) –  random color animation (*i.e,,* random colors on a screen) with soundtrack.  Plaintiff created audio and audio code for this work, with another member of BEIGE.

35.     In addition to his contributions to the video code, music and audio code for the Joint Works, Plaintiff designed and created the physical Nintendo cartridges which housed each of the Joint Works.  The cartridges themselves were physically manipulated, with holes punched into them to show the computer chips, as an exterior, physical manifestation of the hacked programs. In addition, Plaintiff included handwritten titling and credit information on each cartridge.

36.     In creating the Joint Works, and for each of them, Plaintiff and Defendant intended that their contributions be merged into inseparable or interdependent parts of a unitary whole.

37.    Plaintiff and Defendant jointly authored other Joint Works, in addition to the above works, both within and outside of BEIGE.

38.    Plaintiff's and Defendant's joint creative process for the Joint Works is evidenced by, among other things, emails, session records, and master files located in Plaintiff's archive.

**Plaintiff and Defendant Agreed To Joint Authorship For Their Joint Works**

39.    Plaintiff and Defendant agreed to reflect the joint authorship of their Joint Works by crediting them to "Paul Davis and Cory Arcangel," and/or "BEIGE."

**Early 2000s Public Exhibitions**

40.    In the early 2000s, the BEIGE collective and Joint Works created by Plaintiff and Defendant were featured in several public exhibitions and credited to Plaintiff and Defendant, BEIGE, or some combination thereof.[1]

41.    For example, when *Landscape Study* was exhibited at Bitforms Gallery in 2002, the work was credited to Plaintiff and Defendant together, and when *Landscape Study* was

---

[1] Exhibitions of the Joint Works include, Millais Gallery, "Tha Click", Southampton, UK, 2009 [*Landscape Study, I Shot Andy Warhol*]; Seventeen Gallery, "Intentional Computing", London, UK, 2007 [*Fat Bits*]; Event, "Tha Click", London, UK, 2007 [*Landscape Study, I Shot Andy Warhol*]; SF Camerawork, "POP_REMIX", San Francisco, USA, 2004 [*Naptime, Video Ravingz*]; The Horse Hospital, "Big Hand at the Dice Game", London, UK, 2004 [*Fat Bits, Landscape Study*]; New Museum of Contemporary Art, "Killer Instinct", New York, USA, 2003 [*Super Mario Clouds*]; TEAM Gallery, "Throw Back", New York, USA, 2003 [*Super Mario Clouds*]; Tate Britain, "Blinky", London, UK, 2003 [*Naptime, Video Ravingz*]; SUNY Buffalo, "Language and Encoding Symposium", Buffalo, USA 2002 [*Super Mario Clouds*]; Flux Factory, "While You Were Playing With Your Rubix Cube", New York, USA, 2003 [*Landscape Study*]; Foxy Productions, "Blinky", New York, USA, 2003 [*Naptime, Video Ravingz*]; Anthology Film Archives, "New York Underground Film Festival", New York, NY, 2002 [*Fat Bits*]; Bitforms Gallery, "Prints and Chips", New York, USA, 2002 [*Landscape Study*]; Lothringer13 Gallery, "Artist as an Expert", Munich, DE, 2001 [*Fat Bits*]; REMOTE lounge, "ICON", New York, USA 2001 [*Fat Bits*]; Fassbender Gallery, "Interface: Exploring Possibilities", Chicago, USA, 2001 [*Fat Bits*]; Deadtech, "Post-Data in the Age of Low Potential", Chicago, USA, 2001 [*Fat Bits*].

exhibited at the Institute of Contemporary Arts in London in 2003, the installation was credited to BEIGE.

42.     Similarly, when *Super Mario Clouds* appeared on the front page of the New York Times Arts section on January 19, 2003, the work was credited to BEIGE.  At the first institutional exhibition of *Super Mario Clouds* at the New Museum in New York on December 12, 2003, the work was attributed jointly to Plaintiff and Defendant, and has retained this joint attribution there ever since.  *See* https://archive.newmuseum.org/images/6160.

43.     When *Naptime* was exhibited (along with *Super Mario Clouds*) in the 2003 "Killer Instinct" exhibition at the New Museum, the works were credited to both Plaintiff and Defendant; https://archive.newmuseum.org/images/6161.

44.     Plaintiff's and Defendant's other Joint Works were similarly credited to and designated as jointly authored by Plaintiff and Defendant.

45.     During the early 2000s, Defendant was the only member of BEIGE residing and working in New York.  As a result, Defendant had primary responsibility for communicating with third parties in New York and representing BEIGE members' collective interests regarding any events, exhibits, or showings of work by BEIGE and its members that occurred in New York, including without limitation regarding the authorship and credits to be acknowledged for such artworks.

46.     Between approximately 2000 and 2003, Joint Works created by Plaintiff and Defendant were exhibited multiple times, and credited to Plaintiff and Defendant, BEIGE, or some combination thereof, including:

        a.     *Fat Bits,* BEIGE exhibition at Deadtech Gallery, Chicago, June 2001, upon information and belief credited to BEIGE;

b.      *Landscape Study,* at Bitforms Gallery, New York, June 2002, credited to Paul Davis and Cory Arcangel;

c.      *Super Mario Clouds,* at Language and Encoding Symposium, SUNY Buffalo, November 2002, presented by Plaintiff and Defendant; The work was credited as follows "Cory Arcangel and Paul Davis of the BEIGE programming ensemble will present their recent work which deals with reverse engineering Super Mario Brothers cartridges...Cory Arcangel and Paul Davis will discuss this aesthetic language in relation to recent work of theirs…";

d.      From May to June 2003, *Landscape Study, Naptime* and *Video Ravingz* [*sic*] were exhibited as part of the "Blinky" exhibit at the Foxy Productions gallery in New York. Defendant decided which works to show and coordinated with the gallery; "Cory Arcangel/BEIGE" was listed as the exhibiting artist. *See* https://www.foxyproduction.com/exhibitions/191. The accompanying press noted that, "Arcangel also exhibits video works (made with BEIGE collaborators Paul B. Davis and Joseph Bonn) that are programmed and played on reverse-engineered Super Mario Brothers' cartridges." *See* https://www.foxyproduction.com/exhibitions/191/pr. Holland Cotter's June 27, 2003 review of the Blinky exhibit in the New York Times noted that, ". . . the work of the artist collective called Beige reflects the total-immersion 1980's universe of video games. Using obsolete Nintendo software and hacked Super Mario Brothers cassettes, Beige members Cory Arcangel and Paul B. Davis have created beautiful little abstract videos that pulse to an electronic beat. [¶] Both Beige and Paper Rad also produce paintings, though their videos are the real deal." *See* *https://www.foxyproduction.com/exhibitions/191/pr;*

*https://www.nytimes.com/2003/06/27/arts/design/kara-walker-helmut-dorner-cy-twombly.html;*

https://assets-

p.artcat.com/file_uploads/file_asset/asset/6f13222ea0e25cf4b2cc668ae4791929031063d3/60a78f 68d61dbc1188ac3731694c0cc8.pdf. In addition, silk-screened prints of *Landscape Study* were exhibited and sold at this show; Defendant split the profits from the *Landscape Study* print sales with Plaintiff.

      e.    From June to August 2003, *Super Mario Clouds* was exhibited as part of the "Throwback" exhibition at Team Gallery in New York. At the outset, Defendant emailed Plaintiff the text he had prepared for a written mailer, stating that "BEIGE presents new multimedia nintendo art," and listed *Super Mario Clouds, I Shot Andy Warhol,* The 8-Bit Construction Set, various prints and other software, all credited to BEIGE. Team Gallery listed "Cory Arcangel and BEIGE" as the exhibiting artist: "Cory Arcangel & Beige will be represented by two works: one a projection, the other a monitor piece. Arcangel, and his accomplices -- a collective who call themselves 'Beige' -- hack Nintendo game chips and alter their contents. By traveling backward to the nascent technology of 'interactive' video, Arcangel and company rewrite science in reverse, chucking 'advancement' out the window. One work, Shoot Andy Warhol, is a working video game that can be played by visitors to the gallery -- we gain points by shooting Warhol, but lose points if we accidentally shoot Colonel Sanders, the Pope or Flavor Flav. A large wall projection of wondrous blue with white digital clouds is simply a Mario Bros. game chip with all of the human figures removed." *See http://www.teamgal.com/exhibitions/53/throwback.* In an email blast, Defendant also publicized BEIGE as the exhibiting artist for this show.

      f.    In December 2003, the "Killer Instinct" exhibition at the New Museum opened, with *Super Mario Clouds* (then just called "*Clouds*") and *Naptime* on display, and Plaintiff and Defendant credited as joint authors: https://archive.newmuseum.org/images/6160; https://archive.newmuseum.org/images/6161; https://archive.newmuseum.org/exhibitions/411.

**Early 2000s Publications**

47.    In the early 2000s, the BEIGE collective and Joint Works created by Plaintiff and Defendant were featured in published articles, public discussions, and other media, and credited to Plaintiff and Defendant, BEIGE, or some combination thereof, including:

a.    In a December 20, 2002, New York Times article regarding unrelated shows, NYT art critic Holland Cotter noted that, ". . . the model of collective art-making is very much of the moment. It's exemplified today by the ventursome cross-disciplinary activities of groups like . . . Beige . . . ." *See https://www.nytimes.com/2002/12/20/arts/design/gary-simmons-benjamin-butler-andras-borocz.html*.

b.    In a December 29, 2002, New York Times article titled "10 Moments in Art," Mr. Cotter highlighted "Collectives": "Every few decades, young artists take to working in collaborative or communal groups. Several European collectives were in Documenta 11, and the emergence of digitally savvy but low-tech multimedia groups like . . . Beige . . . is by far the most interesting development in new art." *See https://www.nytimes.com/2002/12/29/arts/design/10-moments-in-art.html*.

c.    Holland Cotter's January 19, 2003 article on art collectives, featuring BEIGE and others, https://www.nytimes.com/2003/01/19/arts/art-architecture-doing-their-own-thing-making-art-together.html.

d.    On April 17 and 18, 2003, Plaintiff and Defendant exchanged several emails in which they discussed and compiled documentation on their joint works, including *Landscape Study,* for inclusion in the first edition of the textbook "Digital Art World (World of Art)," by Christiane Paul, an Adjunct Curator of Digital Art at the Whitney Museum. *Landscape Study* had been commissioned as a joint work, and Defendant attributed it as a joint work on his webpage at

15

the time.  *See* https://web.archive.org/web/20020609182841/http://www.beigerecords.com/cory/.
Defendant was solely responsible for forwarding documentation on behalf of Plaintiff and
Defendant, to Professor Paul, and was the only contact between Professor Paul and the BEIGE art
collective.

        e.      In his textbook "Works of Game:  On the Aesthetics of Games and Art"
(2015), Professor John Sharp attributes *Super Mario Clouds* to "Cory Arcangel & Beige," and has
confirmed that Defendant signed off on this attribution for the publication of "Works of Game."

      48.    Although the exact authorship crediting at times varied for certain of the Joint
Works, and in certain exhibitions, in communications with Plaintiff Defendant did not disclaim
Plaintiff's authorship and contributions.

      49.    For example, in 2004 the Whitney Museum selected Defendant to participate and
exhibit collective works in its Whitney Biennial. Defendant was solely responsible for
communications with the Whitney Museum regarding the Biennial, including the works to be
shown and crediting for the works.  Defendant chose to include *Super Mario Clouds, b*ut instead
of crediting the work to Plaintiff and Defendant, as the Parties had agreed, the 2004 Whitney
Biennial catalogue listed *Super Mario Clouds* as authored by "Cory Arcangel/BEIGE:"



Defendant caused the Whitney Museum to change the manner in which *Super Mario Clouds* was credited. This fact is supported, upon information and belief, by the fact that Defendant was solely responsible for communications with the Whitney Museum regarding the Biennial. The Whitney Museum would have had no reason to change the crediting.

50.     In 2004, Plaintiff approached Defendant to have the misattribution of *Super Mario Clouds* corrected. Defendant purportedly acquiesced with that request but claimed he was unsuccessful in getting the museum to correct the record; the 2004 Whitney Biennial catalog and the exhibition credited *Super Mario Clouds* to Cory Arcangel/BEIGE.

51.     When *Rudy's Cake Walk* (under this designation rather than Plaintiff's proposed title "Rudy's Cakewalk") appeared in the 2004 Whitney Biennial catalogue, the work was credited

to "The 8-Bit Construction Set [the band Plaintiff and Defendant formed] (Cory Arcangel/BEIGE)" and "Courtesy BEIGE Records," a record label that Plaintiff formed which ultimately led to the BEIGE art collective. *See* image from the Whitney 2004 Biennial catalogue at paragraph 49, *supra.* According to emails between Plaintiff and Defendant (who communicated with the Whitney Museum regarding the works and crediting to appear in the Biennial), Plaintiff was told the work would be credited to "Cory Arcangel and Paul Davis."

52.    Similarly, when *Naptime* was exhibited at the 2004 Whitney Biennial, the work was credited as a collaboration of Plaintiff and Defendant; although it was incorrectly credited as a work by Cory Arcangel / BEIGE with a subcredit for Music by: Paul B. Davis, rather than as a work by Cory Arcangel and Paul Davis/BEIGE, as Plaintiff and Defendant had agreed. *See* paragraph 49, *supra.* Defendant apologized to Plaintiff for the error; previous and subsequent exhibitions of *Naptime* credited the authors as "Cory Arcangel and Paul Davis / BEIGE."

53.    As a result of the inaccurate crediting of *Super Mario Clouds, Naptime and Rudy's Cake Walk* for the 2004 Whitney Biennial, Plaintiff and Defendant discussed that the titling of their Joint Works would need to be handled differently and accurately in the future. On April 24, 2004, Defendant emailed Plaintiff that *Naptime* would be exhibited at the SF Camerawork gallery in San Francisco, California and asked, "How should it be credited?" Plaintiff responded, "Cory Arcangel and Paul Davis / BEIGE," to which Defendant did not object.

54.    In May 2004, Defendant informed Plaintiff via email that the Whitney Museum had decided to buy editions of *Super Mario Clouds* and *Naptime,* through the (now-defunct) Team Gallery with which Defendant was affiliated at that time, for $4,000, of which Defendant would receive $2,000. This followed a first sale of *Super Mario Clouds* through Team Gallery a few

months before.  Defendant acknowledged that he would split the sales receipts from the sales with Plaintiff.

55.     In November 2004, Defendant emailed Plaintiff about credits for Defendant's next show at Team Gallery in 2005, stating that, "the projects that concern BEIGE are the [Nintendo] works and the TAC [Total Asshole Compression].  I would like to credit them as Cory Arcangel (beige)."  Plaintiff responded that he preferred using "/BEIGE" or ideally just "BEIGE" as the artist; Defendant credited the works as "Cory Arcangel/BEIGE."

56.     To the best of Plaintiff's knowledge, the Joint Works have not been regularly publicly exhibited by Defendant since approximately 2004.  In or about 2007 Plaintiff exhibited *Fat Bits* at Seventeen Gallery in London, and in or about 2009 Plaintiff showed *Landscape Study* in Southampton, UK, with Defendant's knowledge and approval in both instances.  In both instances, the works were credited to "Paul Davis and Cory Arcangel/BEIGE."

57.     Defendant eventually stopped participating as an active member in BEIGE, although he continued to make use of a sub-page on the Beige Records website.

**Unauthorized Changes to the BEIGE Website**

58.     In or about 2010, Plaintiff became aware that, without prior notice or authorization from the administrators of the Beige Records website, Arcangel had modified several pages of the Beige Records website to direct visitors to another website(s) and/or webpage(s), and modified several administrative settings of the Beige Records website/server.

59.     Plaintiff and the remaining members of BEIGE agreed to create an "About Us" page on the Beige Records website in 2010 after Defendant began using Defendant's sub-page to direct viewers away from the Beige Records website, and in ways that did not accurately reflect how the group, including Plaintiff and Defendant, collaborated and agreed to acknowledge their

authorship of their works, and unilaterally modified the website content, including without limitation certain authorship credits there. Among other things, as Defendant increasingly began focusing on work outside the BEIGE collective, his sub-page increasingly focused on solo work and work with others outside of BEIGE. And while Defendant had previously acknowledged to Plaintiff and others that Plaintiff had developed the pioneering method/process of hacking old Nintendo game cartridges to create new artwork (which Defendant then asked to be part of), in later years Defendant began to take credit for developing this process, omitting Plaintiff from the narrative, and attempting to downplay the contributions of Plaintiff and BEIGE.

60.    In or around February 2010, Plaintiff noticed the unauthorized changes that Defendant was making to the website, and removed Defendant's ability to make further changes. On February 5, 2010, Plaintiff received an email from Defendant complaining that Defendant could not log into the beigerecords.com website. Plaintiff received another email from Defendant on February 9, 2010, in which Defendant asked for "access to the directory so [he] can finish doing the re-directs." On February 10, 2020, Plaintiff responded to Defendant that, "your password is unchanged (to your account cory@beigerecords.com) and shouldn't have stopped working, but the password you're asking about is the master password to the [B]eige [R]ecords site. the only people with master access to the site now are the partners in [B]eige [R]ecords, that[']s what we think is best."

**Plaintiff   Discovers   Defendant's   Misattributions   of   the   Joint   Works Solely to Defendant**

61.    While Plaintiff was finishing his Ph.D. in 2018, he investigated various sources to confirm that the information in his research biography was accurate. In the course of this extensive investigation he discovered that the credits for many of the works that he and Defendant jointly authored, and which had previously had been exhibited and credited in ways that acknowledged

the contributions of both of them and/or BEIGE, had been changed on various websites, sources and media - not at Plaintiff's behest or with his knowledge or consent - to inaccurately reflect that Defendant was the sole author.

62.    Plaintiff's 2018 research disclosed that, at various times subsequent to Plaintiff's and Defendant's agreement regarding the crediting of the authorship of the Joint Works to both Plaintiff and Defendant, and after the works had been exhibited, displayed and or published with credit to both Plaintiff and Defendant (and/or BEIGE), Defendant began presenting himself in interviews, articles and to the public more generally as the sole author and copyright owner of the Joint Works.

63.    For example, in 2018, Plaintiff learned of the following misattributions of the Joint Works, eliminating mention of Plaintiff's joint authorship of same:

a.    *Video Ravingz* [*sic*] – this Joint Work was only minimally exhibited prior to 2005, if at all.  Defendant's listing at https://dinca.org/cory-arcangel-video-ravings/ identifies *Video Ravingz* as authored solely by Defendant.  Upon information and belief, Defendant or someone acting on Defendant's behalf (but unknown to Plaintiff at this time), was responsible for the crediting of *Video Ravingz*.

b.    *Super Mario Clouds* - Plaintiff discovered in 2018 that at some date subsequent to the 2004 and 2005 communications between Plaintiff and Defendant, the attribution of this work to BEIGE was completely removed, so that the Whitney Museum's webpage listing for *Super Mario Clouds* now identifies Defendant as the sole author of *Super Mario Clouds*, and states that rights and reproductions to the Joint Work are credited to "©Cory Arcangel" and "Courtesy of the artist."  *See https://whitney.org/collection/works/20844*.  All references to BEIGE were also removed from the 2004 Whitney Biennial archive website.    *See,*

21

*https://whitney.org/exhibitions/biennial-2004*.   Upon information and belief, the change in the crediting of *Super Mario Clouds* was done at the request and/or with the consent of Defendant (who was the only member of BEIGE who communicated with the Whitney Museum regarding the Joint Works exhibited at the 2004 Biennial) or person(s) acting on Defendant's behalf; and such a change in artist attribution would not normally be made, particularly by a museum, without an artist's request or participation.

        c.     *Rudy's Cake Walk* - Similarly, Plaintiff discovered in 2018 that the Whitney Museum's webpage listing for *Rudy's Cake Walk* now credits Defendant alone as the author. *See https://whitney.org/collection/works/20844*.   Upon information and belief, based on Defendant's past communications with the Whitney Museum, the change in the crediting of *Rudy's Cake Walk* was done at the request and/or with the consent of Defendant (who was the only member of BEIGE who communicated with the Whitney Museum regarding the Joint Works exhibited at the 2004 Biennial) or person(s) acting on Defendant's behalf; and such a change in artist attribution would not normally be made, particularly by a museum, without an artist's request or participation.   The Whitney Museum's website also indicates that in 2005, the museum purchased a copy of *Rudy's Cake Walk* "with funds from the Painting and Sculpture Committee – which was never disclosed to Plaintiff, in 2005 or at any subsequent time. *Id.*

        d.     *Naptime* - In 2018 Plaintiff learned that an edition of *Naptime,* credited solely to Defendant, was being offered for sale on the Art Bartschi and Cie website – although the cartridge shown in the photo of the work was clearly marked "Beige," consistent with Defendant's past practice of attributing Nintendo cartridge work to BEIGE:



Plaintiff was not consulted by either Defendant or by Art Bartschi and Cie regarding the crediting of *Naptime*. Upon information and belief, the crediting of *Naptime* on the Art Bartschi and Cie website was done at the request and/or with the consent of Defendant or person(s) acting on Defendant's behalf.

> e.     *Landscape Study* - Also in 2018, Plaintiff discovered that *Landscape* Study had been and is now listed on the Bitforms website as solely authored by Defendant; the website was specifically changed to remove Plaintiff's name from the credits. ***See*** https://bitforms.art/exhibition/prints-chips/ca_landscapestudy_w/. Defendant was the only person to communicate with Bitforms regarding the crediting for *Landscape Study* when it was originally exhibited at the gallery. Upon information and belief, the change in the crediting of

*Landscape Study* was done at the request and/or with the consent of Defendant or person(s) acting on Defendant's behalf.

64.     In 2018, Plaintiff discovered that the first and third editions of the "Digital Art (World of Art)" textbook by Christiane Paul (who has been a professor at the New School since 2009, in addition to being an Adjunct Curator at the Whitney Museum), attributes *Landscape Study* solely to Defendant; Plaintiff's name was omitted from the credits.  As Defendant had been solely responsible for communicating with Professor Paul regarding Plaintiff's and Defendant's Joint Works and the attribution for them for the first edition of "Digital Art  (World of Art)," and Plaintiff has had no communication with Professor Paul regarding any changes to the crediting of the Joint Works, upon information and belief, Defendant or someone acting on Defendant's behalf (but unknown to Plaintiff at this time), was responsible for communicating the omission of Plaintiff from the credits, with Professor Paul.

65.     The misattribution in "Digital Art (World of Art)" of *Landscape Study* as a work authored solely by Defendant has been perpetuated and exacerbated in that, as Plaintiff discovered during his 2018 research, Professor Paul's discussion of *Landscape Study* has been directly quoted or referenced by many others, including the Stanford Encyclopedia of Philosophy (in its entry on Digital Art), various Ph.D. and graduate theses, and in university course curricula.[2]

---

[2] *See, e.g.,* Stanford Encyclopedia of Philosophy, https://plato.stanford.edu/entries/digital-art/; Ph.D. and M.F.A. theses examples, https://ecommons.cornell.edu/bitstream/handle/1813/3904/1DISS.FRONT.MATTER.SM.pdf, https://www.academia.edu/40042118/Coding_Mind_Body_Dualism; Emerson College "VM470 Advanced New Media Projects" Class Reading List, https://vm470.wordpress.com/digital-art-christiane-paul/; UC Santa Cruz "Review Sheet for Final Exam Film20," question "What process did Cory Arcangel use to create Landscape Study?," https://www.docsity.com/en/review-sheets-for-final-exam-the-film-experience-film-20/6493967/; Videogames and Education (2014), Harry J. Brown, Taylor & Francis Press, p. 34 (textbook discussion of *Landscape Study*, referencing the Professor Paul's book as its source.

66.    In addition, the third edition of Professor Paul's textbook contains an image of a *Super Mario Clouds* cartridge, credited to Defendant; in fact the cartridge was modified and constructed by Plaintiff.  *See* https://thamesandhudson.com/digital-art-9780500204238.

67.    Since 2018, Plaintiff has discovered approximately five other textbooks with misattributions of authorship for *Landscape Study* or *Naptime*, and a dozen or more attributing authorship of *Super Mario Clouds* to "Cory Arcangel" instead of "Cory Arcangel/BEIGE."

68.    Since 2018, Plaintiff has learned that Defendant has presented himself in interviews as the sole author of the Joint Works.  For example:

a.    In a 2019 lecture at the Zurich University of the Arts, Defendant discussed hacked Nintendo artworks and posed the question, "What was going on that made me do these pieces?;" his answer omitted Plaintiff's development of the Nintendo practice, BEIGE, and any of Plaintiff's and Defendant's collaborations.  *See https://www.youtube.com/watch?v=lnAep3fYoYE.*

b.    In a 2019 artist talk at the Philadelphia Institute of Contemporary Art, Defendant discussed his work and The 8-Bit Construction Set, but refused to name BEIGE or anyone involved in BEIGE, including Plaintiff, instead saying that Defendant produced the 8-Bit Construction Set with his "friends."   *See https://www.youtube.com/watch?v=6O7wegfNOdc.*

69.    In 2020, Plaintiff learned that *Totally Fucked,* was being shown by Defendant at Lisson Gallery's Cork Street gallery from November to December 2020, and described on Lisson's website as created by "Cory Arcangel," without any recognition of Plaintiff's joint authorship.  *See,  https://www.lissongallery.com/exhibitions/cory-arcangel-totally-fucked.*    Defendant has exhibited works at Lisson Gallery at various times since 2011, and upon information and belief, Defendant or someone acting on Defendant's behalf (but unknown to Plaintiff at this time), was responsible for the crediting of *Totally Fucked.*

25

70.     These credits and designations of the Joint Works as solely authored by Defendant eliminate Plaintiff's contributions to and joint authorship of the Joint Works, and they are therefore unlawful misrepresentations.

71.     After Plaintiff's and Defendant's above and other Joint Works were first created and displayed, with credit to both Plaintiff and Defendant (and/or BEIGE), upon information and belief, Defendant caused and/or allowed the attribution to Plaintiff and/or BEIGE for the Joint Works to be removed and eliminated.

72.     Upon information and belief, due to Defendant's acts, the Joint Works are now attributed to and designated as solely authored by Defendant.

**Defendant Has Unilaterally Exploited, Sold, And Created Editions Of Various Joint Works For Sale**

73.     In the time since the Joint Works were originally created by Plaintiff and Defendant as joint authors and co-owners of the copyrights in those Joint Works, Defendant has unilaterally sold or authorized the sales of certain of the Joint Works, without paying or accounting to Plaintiff for any of the monies and other financial benefits from the sale, use or other exploitation of the Joint Works.

74.     In the time since the Joint Works were originally created by Plaintiff and Defendant as joint authors and co-owners of the copyrights in those Joint Works, Defendant has created editions of certain of the Joint Works, and has offered those Works for sale and sold those Joint Works, without paying or accounting to Plaintiff for any of the monies and other financial benefits from the sale, use or other exploitation of the Joint Works.

75.     *Totally Fucked* has an edition of five.  Upon information and belief, one of the editions was sold by Greene Naftali in 2019, and another of the editions was offered for sale by Lisson Gallery from November to December 2020, both credited solely to Defendant.

76.     In late 2020 or early 2021, Plaintiff learned that Defendant had created and sold three further editions of *Super Mario Clouds*.

77.     Plaintiff recently learned in 2021 that a copy of *Naptime* had been sold, and presumes that it was sold by Art Bartschi and Cie.

78.     Upon information and belief, at least one edition of *Super Mario Clouds* has been resold on the secondary market, for which Defendant received a resale royalty.

79.     Defendant sold at least one edition of each of *Super Mario Clouds* and *Rudy's Cake Walk,* to the Whitney Museum.  Although those works were originally exhibited during the 2004 Whitney Biennale with author credits to Cory Arcangel/BEIGE and to the Parties' band 8-Bit Construction Set, respectively, the Whitney's website currently credits both solely to Defendant. *See* https://whitney.org/collection/works/20844; https://whitney.org/collection/works/20588.

80.     Additionally, Plaintiff has learned that Defendant has also unilaterally sold other works attributed to "BEIGE," or to "Cory Arcangel/BEIGE."

81.     Upon information and belief, Defendant has been represented by and/or exhibited with at least Art Bartschi and Cie. (now Wilde Gallery) at various times since at least 2007, with Lisson Gallery at various times since at least 2009, and with Greene Naftali Gallery at various times since at least 2015.

82.     To the best of Plaintiff's knowledge, information and belief, only Defendant has had access to and marketed, sold, and/or offered for sale editions of the Joint Works, or any of them, since at least 2004.

83.     It could only have been Defendant who could have authorized the sales and consigned the works ultimately sold by those galleries (to the extent that they were selling the

works as primary market works (understood in the art market as those being sold from a direct relationship with or directly by the artist) as opposed to secondary market sales.

84.     Based on all of the foregoing, the only conclusion is that Defendant and/or third parties acting on Defendant's behalf, have been responsible for the sales of the editioned Joint Works to date.

85.     Defendant has not paid or accounted to Plaintiff for any of the monies and other financial benefits from the sale, use or other exploitation of the above-noted Joint Works.

86.     Upon information and belief, Defendant has exploited, sold, and/or created editions of various other Joint Works, without Plaintiff's knowledge or consent, and without paying or accounting to Plaintiff for any of the monies and other financial benefits from the sale, use or other exploitation of the Joint Works.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

87.     Plaintiff repeats and realleges each of the allegations set forth in the paragraphs above as though fully set forth herein.

88.     Plaintiff and Defendant co-created and jointly authored original artistic works between the late 1990s and early 200s, including without limitation, "*Fat Bits,* "*Landscape Study*," "*Super Mario Clouds*," "*Rudy's Cake Walk*," "*Naptime*," and "*Totally Fucked,*" referred to above as "Joint Works."

89.     Plaintiff's authorship included conceiving and executing critical aspects of each of the Joint Works.

90.     Plaintiff's contributions to the Joint Works were independently copyrightable and represented original artistic expression.

91.     Plaintiff and Defendant intended their contributions to the Joint Works to be merged into inseparable and interdependent parts of a unitary whole.

92.     Plaintiff's and Defendant's works constitute joint works under the Copyright Act, 17 U.S.C. §101 *et seq.*

93.     The Joint Works constitute works of visual art under 17 U.S.C. §101 and 17 U.S.C. §106A.

94.     The Joint Works are original works subject to the rights and protections under the Copyright Act, 17, U.S.C. §101 *et seq.*

95.     Plaintiff is an author of each of the Joint Works.

96.     Plaintiff Davis is entitled to claim authorship of the Joint Works under 17 U.S.C. §106A(a)(1)(A).

97.     Plaintiff was never an employee of Defendant.

98.     Plaintiff never agreed in a signed writing that the Joint Works should be considered works made for hire, and never assigned or transferred any rights in and to the Joint Works or the copyrights in the Joint Works.

99.     Plaintiff is entitled to an equal undivided ownership interest in each of the Joint Works, including in the copyrights in and to each of the Joint Works.

100.    Plaintiff and Defendant agreed to specific conventions for identifying their joint authorship of the Joint Works.

101.    Plaintiff never transferred or waived his right to claim authorship of the Joint Works.

102.    Defendant has repudiated Plaintiff's co-ownership and co-authorship of the Joint Works, including without limitation, *Super Mario Clouds, Rudy's Cake Walk, Landscape Study,*

*Naptime, and Totally Fucked*, by presenting himself in interviews, articles and the public generally as the sole author of the Joint Works and/or causing and/or allowing Plaintiff's authorship credit to be removed from the Joint Works, and instead presenting, causing and/or allowing the Joint Works to be presented, exhibited and/or sold as works authored and owned solely by Defendant.

103.    By virtue of the foregoing, an actual and justiciable controversy exists between Plaintiff and Defendant concerning Plaintiff's status as a co-author and co-owner of the Joint Works.

104.    Plaintiff is entitled to a declaratory judgment by this Court adjudging and declaring that (a) Plaintiff is the co-author and co-owner of each of the Joint Works and that Plaintiff owns an equal undivided interest in each of the Joint Works; (b) Plaintiff is entitled to receive from Defendant income and profits derived and/or received by Defendant through Defendant's claims of sole authorship of the Joint Works; (c) Plaintiff is entitled to sell Joint Works and/or to prepare new derivative works derived from the Joint Works, subject to an obligation to account for a share of profits from such sales.

## SECOND CAUSE OF ACTION

### (Injunctive Relief Under the Visual Artists Rights Act, 17 U.S.C. §106A)

105.    Plaintiff repeats and realleges each of the allegations set forth in the paragraphs above as though fully set forth herein.

106.    The Joint Works include works of visual art under 17 U.S.C. §106A.  Among others, *American ROM* was created by Plaintiff and Defendant, with each contributing video code to produce a still cityscape image with changing background colors.

107.    In addition, each of the Nintendo cartridges designed and created by Plaintiff to house the Joint Works is a work of visual art under 17 U.S.C. §106A.

108.    Moreover, the Parties created prints of certain of the Joint Works, which are works of visual art under 17 U.S.C. §106A

109.    By virtue of the foregoing, Plaintiff is entitled to preliminary and permanent injunctive relief (a) restraining and enjoining Defendant from denying Plaintiff's authorship of Joint Works which are subject to VARA, or claiming an interest inconsistent with Plaintiff's right to claim authorship of such works; and (b) directing Defendant to correct and/or cause to be corrected any misstatements or misrepresentations by Defendant regarding Plaintiff's co-authorship and joint authorship of the Joint Works encompassed by VARA, including but not limited to, that a Joint Work was or is solely authored by Defendant and/or any credit, designation, listing or other reference to any Joint Work that fails to designate Plaintiff as joint author of such Joint Work.

### THIRD CAUSE OF ACTION

**(Accounting, Imposition of Constructive Trust and Payment To Plaintiff)**

110.    Plaintiff repeats and realleges each of the allegations set forth in the paragraphs above as though fully set forth herein.

111.    Upon information and belief, Defendant has and is continuing to receive monies and other financial benefits from the sale, use or other exploitation of the Joint Works.

112.    Plaintiff is entitled to an accounting of all monies and other financial benefits received or derived by Defendant from the sale, use or other exploitation of the Joint Works.

113.    To the extent that Defendant has received or will receive any receive monies and other financial benefits as a result of the sale, use or other exploitation of any of the Joint Works, Defendant holds those revenues in trust for Plaintiff, pending an accounting and payment to

Plaintiff in an amount reflecting and derived from Plaintiff's equal undivided interest in such Joint Works.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

(a)     On Plaintiff's First Cause of Action, a declaratory judgment that:

1.     Plaintiff is the co-author and co-owner of each of the Joint Works;

2.     Plaintiff owns an equal and undivided interest with Defendant in each of Joint Works, including in the copyrights in and to each of the Joint Works.

3.     Plaintiff is entitled to receive from Defendant income and profits derived and/or received by Defendant through Defendant's claims of sole authorship of the Joint Works; and

4.     Plaintiff is entitled to sell Joint Works and/or to prepare new derivative works derived from the Joint Works, subject to an obligation to account for a share of profits from such sales.

(b)     On Plaintiff's Second Cause of Action:

1.     Preliminarily and permanently restraining and enjoining Defendant from denying Plaintiff's authorship of the works Plaintiff co-authored with Defendant;

2.     Preliminarily and permanently restraining and enjoining Defendant from claiming an interest inconsistent with Plaintiff's right to claim of authorship of the works;

3.   Preliminarily and permanently restraining and enjoining Defendant, and Defendant's officers, employees, agents, servants, galleries, attorneys, and representatives, and all other persons, firms or corporations in active concert or participation with them, from using, marketing, or selling as solely Defendant's own work, all works, artworks, products and/or services that were created jointly by Plaintiff and Defendant;

4.   Directing Defendant to provide corrective or remedial notice to any persons or entities to whom Defendant has denied Plaintiff's authorship of Joint Works, or to whom Defendant has claimed an interest inconsistent with Plaintiff's right of authorship, including any claims by Defendant that Defendant solely authored such Joint Works;

5.   Directing Defendant to inform all third-parties holding Joint Works, but credited only to Defendant, that Plaintiff is a joint author of the Joint Works and to instruct such third parties to correct the attribution of authorship of such works to "Cory Arcangel and Paul Davis" or "Paul Davis and Cory Arcangel;" and

6.   Directing Defendant to file with this Court, within thirty days after entry of any injunction and/or judgment in this case, a written statement under oath that sets forth the manner by which Defendant has complied with the injunction.

(c)   On Plaintiff's Third Cause of Action:

1. Directing Defendant to account to Plaintiff for all income, profits and other benefits that Defendant received or derived from the sale, use, or other exploitation of the Joint Works;

2. Adjudging and declaring that Defendant holds in trust, as constructive trustee for the benefit of Plaintiff, all income, profits and other benefits that Defendant received or derived from the sale, use, or other exploitation of the Joint Works; and

3. Awarding Plaintiff damages from Defendant in an amount to be determined at trial.

(d) Awarding Plaintiff his full costs and reasonable attorney's fees incurred in connection with this action.

(e) Such other and additional relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:  April 5, 2022

MAZZOLA LINDSTROM LLP

By: *Wendy J. Lindstrom*

Wendy J. Lindstrom
Stephen L. Brodsky
Hanoch Sheps
1350 Avenue of the Americas, 2nd Floor
New York New York 10019
P:  646.216.8300

Laura D. Castner
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA  90067
P:  310.694.8585
laura@mazzolalindstrom.com

*Attorneys for Plaintiff Paul B. Davis*